TIMMONS-GOODSON, Judge.
Defendant Lavoris Monteiz Battle was charged with robbery with a firearm. The State's evidence tends to show that on the evening of 23 July 2002, Phyllis Whitehurst was working at the Fisher Fuel Market. At approximately 9:15 p.m., Whitehurst began getting ready to close and put all of the money from the cash register, "other than a couple of tens, fives, ones," in a cigar box below the register. Around 9:20 p.m., Whitehurst noticed a man slumped against the wall by the door. Whitehurst then realized that the man was holding a gun which was a ".22, . 25, or .380" and appeared to be "chrome, nickel-plated silver." The man said to Whitehurst, "Give me the cash and you won't get hurt." Initially, Whitehurst moved towards the cigar box containing the "major money." However, the man moved to the front of the counter and directed her to remove the money from the cash register and she complied. The man then asked Whitehurst two times where the safe was and she responded that it was under the rug. He demanded that she open the safe and she told him that she did not have the keys. He took some keys from another cigar box and instructed Whitehurst to open the safe. However, none of the keys fit the safe. At that point, Whitehurst told the man that he better leave because a car had pulled up to the fuel pump and the customer would want to pay. The man left and Whitehurst activated the panic button, which signaled that she had been robbed. She then went outside to see if anyone had noticed in which direction the thief had gone. During the course of the robbery, Whitehurst noticed that the man was wearing either baseball or golf gloves.
Lieutenant Dalton Hardison of the Craven County Sheriff's Department responded to a call reporting the robbery at Fisher Fuel Market at approximately 9:21 p.m. Lieutenant Hardison met Deputy Todd Swindell, also of the Craven County Sheriff's Department, at a road block approximately five miles down the road from Fisher Fuel Market. Deputy Swindell pointed out a maroon Mustang and informed Lieutenant Hardison that the three occupants were "acting very suspicious." Defendant was seated in the back of the vehicle and appeared sweaty and nervous. Defendant and the two other occupants of the vehicle were taken into custody. A search of the vehicle produced a .25 handgun, white baseball gloves, a red shirtand a blue shirt.
After taking defendant into custody, police officers asked Whitehurst to identify a suspect they had in custody. The officers walked Whitehurst out to a police car, in which defendant was sitting alone. Based on defendant's physical appearance, Whitehurst did not recognize him and she "thought they had the wrong person." However, defendant said something to Whitehurst in a low voice. When he repeated himself louder, she recognized the voice, "without a doubt," as the person who had robbed her.
Defendant was then transported to the Craven County Sheriff's Department, where Investigator Lee Thomas read him his Miranda rights, whereupon defendant responded that he better get an attorney. Then, unprovoked, defendant stated, "The two people with me had nothing to do with this. Let them go. I did this on my own." When Investigator Thomas searched defendant's person, he found $31 (comprised of one, five, and ten-dollar bills) in defendant's front pocket.
At trial, Whitehurst again identified defendant as the person who robbed her at gunpoint on 23 July 2002. She also identified both the gun and the gloves, which were found in the vehicle in which defendant was a passenger on the evening of the robbery, as those used in the robbery. Additionally, two videotapes produced by store surveillance cameras in operation during the robbery were played for the jury at trial. The videotapes showed a man with a gun wearing a hood, dark pants, a red shirt and baseball gloves. A jury found defendant guilty as charged, and the trial courtsentenced him to a presumptive term of 117-150 months imprisonment. Defendant appeals.
Defendant's sole argument on appeal is that the trial court erred in denying his motion to suppress Whitehurst's voice identification. Specifically, defendant argues that the identification procedure was unduly suggestive. Defendant contends that he was "the only person presented to Ms. Whitehurst. He was presented while in police custody. Ms. Whitehurst had been told defendant was a suspect before she identified him." We disagree.
Our Supreme Court has held that voice identification is admissible, unless barred by constitutional grounds. State v. Jackson, 284 N.C. 321, 327, 200 S.E.2d 626, 630 (1973). The same constitutional "principles found in cases involving identification by sight" apply to voice identification cases. Id. at 329, 200 S.E.2d at 631. In State v. Turner, our Supreme Court concluded that show-up identifications, "even though suggestive and unnecessary, are not per se violative of a defendant's due process rights." 305 N.C. 356, 364, 289 S.E.2d 368, 373 (1982). Rather, with respect to show-up procedures, the Court noted:
The primary evil sought to be avoided is the substantial likelihood of irreparable misidentification. . . . An unnecessarily suggestive show-up identification does not create a substantial likelihood of misidentification where under the totality of the circumstances surrounding the crime, the identification possesses sufficient aspects of reliability.
Turner, 305 N.C. at 364, 289 S.E.2d at 373 (citations omitted). InTurner, the Court also identified five factors to be considered in determining whether there was substantial likelihood of irreparable misidentification. These factors include:
The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.
Id. at 365, 289 S.E.2d at 373-74 (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)).
Defendant acknowledges that "Ms. Whitehurst was quite certain of the identification" and that "there was only minimal time between the crime and the pre-trial identification." Hence, the fourth and fifth factors of the Turner test are not in dispute. Moreover, analysis of the remaining factors also support the admission of the voice identification testimony under the Turner test.
In addressing the first factor, defendant argues that Whitehurst's testimony established that the robbery was "very quick" and, therefore, the incident did not afford her sufficient opportunity to hear him. We note, however, that Whitehurst testified that she heard defendant say, "Give me the cash and you won't get hurt," and subsequently had the opportunity to hear defendant when he instructed her to remove the money from the cash register and when he twice asked her where the safe was. Further, Whitehurst was within close enough physical proximity to defendant to provide ample opportunity for her to hear him. As Whitehursttestified, defendant was "[i]n [her] ear because at one point, [she] was on the floor and he was above [her]."
Similarly, we believe that the State presented adequate evidence to establish that, under the second factor of the Turner test, Whitehurst's degree of attention to defendant's voice during the robbery was substantial. In her testimony, Whitehurst not only recalled the exact words spoken by defendant, but she also remembered a specific moment during the robbery when she was "only hearing the voice." This evidence suggests that, during the robbery, Whitehurst was paying close attention to defendant's voice.
Finally, we posit that the third Turner factor - the accuracy of the witness' prior description of the criminal - is not applicable to this case, since no prior description of defendant's voice was given by the witness. In the absence of a prior voice description altogether, the reliability of the voice identification is neither strengthened nor weakened.
Even assuming arguendo that the voice identification of defendant was erroneously admitted at trial, any error in this regard was non-prejudicial. See State v. Hardy, 104 N.C. App. 226, 238, 409 S.E.2d 96, 102 (1991) ("An error is not prejudicial unless a different result would have been reached at the trial if the error in question had not been committed.")(quoting State v. Smith, 87 N.C. App. 217, 222, 360 S.E.2d 495, 498 (1987), disc. reveiw denied, 321 N.C. 478, 364 S.E.2d 667 (1988)). The jury had before it testimony that the gun, gloves and shirt, worn by the thiefduring the robbery, were found in the vehicle in which defendant was traveling shortly after the robbery. Additionally, the State presented evidence which showed that the money, taken by the thief during the robbery, was found on defendant's person after his arrest. Coupled with the videotapes of the robbery and defendant's subsequent incriminating statement of "I did this on my own," we conclude that there is no "reasonable possibility that the outcome of the trial would have been any different" absent the voice identification of Whitehurst. Id. (quoting State v. Smith, 87 N.C. App. 217, 222, 360 S.E.2d 495, 498 (1987)).
For these reasons, we hold that defendant received a fair trial, free of prejudicial error.
No error.
Judges CALABRIA and ELMORE concur.
Report per Rule 30(e).